As you know, we have our good colleague, Judge Keenan, on the film, and we're going to try to be deferential to her questions, and we hope that you will be watching out for them, too. And with those thoughts, we'll start with number 147746, Raynor v. Pugh. May it please the Court, my name is Brian Schmalzbeck, and I'm honored to represent the appellant, Mr. James Raynor. This Eighth Amendment case is about the brutal attack on Mr. Raynor and the evidence that the defendant, Mr. Pugh, chose to watch and laugh at the attack rather than lift a finger to help. It was error to grant summary judgment for two reasons. First, there are hotly contested disputes of material fact regarding Pugh's deliberate indifference to the attack, as well as the severity of Mr. Raynor's injuries. And second, and even more egregious, the District Court put Mr. Raynor in an impossible position by blocking all discovery of evidence and then faulting Mr. Raynor for a lack of evidence. If Mr. Raynor had the same opportunity, the same reasonable opportunity for discovery that all civil litigants ordinarily enjoy, it would be even more clear that this case is one for a jury to decide. On that point about discovery, what exactly is your argument with respect to the expert? In other words, are you saying the District Court should have on its own appointed an expert? What is your argument, factually? I think there's two separate arguments. The argument I was just referring to is that the District Court entered a discovery stay. I understand that. But what should it have done? It should have closed that discovery stay before entering summary judgment. It should have ruled on the summary judgment on the qualified immunity question? Yes. It should have ruled on the qualified immunity question by saying that qualified immunity is not appropriate. Because I don't think Mr. Pugh has disputed that Mr. Raynor has a clearly established right to be protected from inmate violence when Pugh is aware that that violence is going to take place. So the District Court, when it reached the qualified immunity question, it should have denied qualified immunity. And at that time, there was no reason for the discovery stay to remain in effect. And so it should have allowed discovery to take place. Okay. But I hear you about that, but I want to actually go a layer below that. Then is your submission that District Court should have appointed an expert for your defendant? That would have been appropriate, Your Honor, but not necessary. Okay. So then what would have happened? What would have happened is that Mr. Raynor would have had access to discovery to several important categories of evidence, the most obvious of which is the security video itself, which would have confirmed his version of events. It would have confirmed Pugh's deliberate indifference to the attack. Yeah, no, I hear you on that, and that's why I'm trying to focus on the whole medical thing. Yes. Which, remember, was your second argument. You set it up, and that was your second argument. So what I'm wondering is what, in your view, should have happened? Was the District Court required to look at the x-rays herself? Did she have to appoint an expert? What is it that you think should have happened that didn't happen? As to that argument, the District Court should have considered that evidence as probative evidence of a serious injury. I don't think a medical expert was necessary at all to interpret those because, to be clear, the evidence was not x-rays.  So maybe an expert should have been appointed if all the evidence we had was the x-rays themselves. But that's not what's at issue. Here we had a radiologist who interpreted the x-rays and provided the diagnosis in plain English on this report, and all the jury would need to do to see a serious injury is to compare the radiologist's reports before the attack with this report after the attack that diagnosed Mr. Rainer with degenerative disc disease in this location. It took your client a good long time to complain after the fact about this incident, isn't that correct? About his serious back injury? No, not at all, Your Honor. He complained at the incident, and then he waited several months. Well, Your Honor, the evidence shows that he complained in May that the prison officials actually… And when did the incident take place? In January, Your Honor.  Yes, but to the extent that there is a gap there, that gap only appears in the evidence now because Mr. Rainer was not allowed discovery. He was not provided his medical records, which he requested multiple times. And Mr. Rainer expects that if those medical records are complete and accurate, they will reflect that in January, in the same month of the attack, he was already complaining about back pain and continued to complain. Can you assert that there are some records from February, March, April that somehow there are further complaints? I didn't read anything in your papers. I mean, are you saying that they withheld some medical records? No, Your Honor. They withheld medical records because no discovery was allowed into them. Mr. Rainer doesn't have medical records. I do understand that argument, but we're looking at the record as it is right now in front of us. Yes, Your Honor. And we have the incident that took place in January. That's correct. And we have no complaints about it until for four months. Right, as the record stands now. And that record is incomplete because there hasn't been discovery to flesh out the record. Well, there aren't going to be any more records. I mean, are you making the claim that there are? I thought we just established that you weren't making the claim that they're hiding records so that the records are complete. Your Honor, what I'm saying is that Mr. Rainer doesn't have the records. The records are in the possession of the commonwealth. And so we need a discovery to get access to those records so that we could flesh out the record in this case. Okay. Let's do a hypothetical. Suppose there are no complaints in those four months. If there are no complaints in those four months, there's still evidence that Mr. Rainer was complaining during that time. Your Honor, he says in the inmate complaints that are submitted with his opposition to summary judgment that he has been complaining to medical ever since January 10th that he's in back pain. So there is already sufficient evidence in the record to conclude that he was complaining during that time. You're saying he was complaining all along? Yes, Your Honor, exactly. If you look at it in a light-wish variable to him, is that what you're saying? That's exactly right. And that's required on summary judgment. But to the extent there's any question about that gap, it would be unfair to blame Mr. Rainer for not filling it in when he didn't have those records that will fill it in once he's given access to them. But your argument isn't, I thought you just told me, dependent on those records filling it in. Because those records, I mean, you may be prepared to believe that they're withholding records from you, but I'm not sure I'm prepared to believe that. But what I thought your argument was, in any event, he orally was complaining, and they may not have made a record of that. It's not withholding records. Isn't that what you're saying? Yes, Your Honor. He did orally complain. He says he did. Yes, he says he did. And on summary judgment, that evidence is taken as true. But beyond that, there are additional records that aren't necessarily being withheld in a malicious sense, but just in the sense that he has not been given access to them through discovery. There are other records that exist. Right. That may exist. Right. Mr. Rainer believes that there will be records that reflect the complaints that he made. What else are you going to do besides get the rest of the records, and then you go get an expert? What other discovery did you say you were denied? Well, the first thing that he was denied was the security video itself. That's the classic dispute. Does it exist? The Commonwealth has not denied that it exists. And on summary judgment, that's an inference that should be granted in Mr. Rainer's favor, that there is a security video and that it will confirm his version of events. Of course, we've gotten all into the second issue where you started out, you structured your argument. So maybe you want to talk a little bit about the first issue. Yes, Your Honor. Thank you. So I'd like to start with the evidence that Mr. Pugh was deliberately indifferent. And he was deliberately indifferent in two separate ways. First, he had advanced knowledge that this attack would take place, and he did nothing to prevent it. And second, he saw the attack as it unfolded and did nothing to stop it. Now, starting with the advanced warning, in the verified complaint, Mr. Rainer testifies to this exchange immediately before the attack, where his cellmate Mullins tells Pugh to his face, if you make me move cells, I'm going to attack him. And Pugh's response, I don't care. You're moving cells or you're going to segregation. And then Mullins replies, it's on. So that shows deliberate indifference. It shows that Pugh had actual awareness that there's a substantial risk that this attack was going to take place. And he disregarded it. He said, I don't care, and he sent both men into the cell. And that prompted the attack. Now, the second way that Pugh was deliberately indifferent is that he saw the attack as it was underway and failed to stop it. Here, Mr. Rainer's evidence shows that Pugh stood nearby, watched the attack as it unfolded, smiled, and even laughed, but did nothing to stop it. He had a radio in his hand that he could have used to call for backup, but he didn't use it. He could have ordered Mullins to stop, but he didn't raise his voice at all. Again, that shows deliberate indifference. He had actual awareness because he saw the attack, and he disregarded it. He did nothing. This court has actually found deliberate indifference on basically identical facts. That's the Cartman case. We ask that you apply Cartman to its twin here. In Cartman, again, the officer stood, smiled, and watched as the attack took place. And this court said that was deliberate indifference because he was actually watching the attack, and he unreasonably delayed in breaking it up. And that's exactly what we have here. So we ask that you reverse based on that straightforward application of Cartman. Now, I'll also address the evidence that Mr. Rainer suffered serious injuries in this attack. His evidence shows that he suffers from severe back pain, chronic, severe back pain. It's actually gotten worse over time. And he also suffers from numbness in his legs that causes him to fall and suffer further injuries. Isn't the gist of the State's argument that he had this back pain before this incident? The State has suggested that Mr. Rainer had medical issues before, and there's certainly evidence that he has had medical issues. But there's no evidence that his medical issues included this chronic, severe back pain that actually woke him up out of his sleep, and that the falls after January were caused by numbness in his legs that started after the attack in January. Well, he needed somebody in prison to take care of him before this incident. That's how this incident all arose, right? Yes, that's right, Your Honor, because he had a host of medical issues. He had blood problems and breathing issues. But I don't think there's any evidence that he suffered the sort of chronic, severe back pain and numbness that causes falling. Well, there are x-rays about back problems before. Yes, and it's very important what those x-rays say, because none of the x-rays in 2012 and before show this specific disease, this degenerative disc disease, in this location. That's new in 2013 after the attack. But there's other evidence that corroborates this. There's the attack itself. I think it's important to remember what's alleged, that this attack knocked a large man, the Commonwealth says a 300-pound man, from his feet onto his tailbone and spine. A jury could easily conclude that that amount of force would cause a serious spinal injury. Then there's the testimonial evidence, of course. Was it onto a concrete floor? That's not – I don't know, Your Honor, that's not in the record, but that may be the sort of thing that you could determine from the security video, which would also show exactly what happened, how he landed. There's also the wheelchair. There's undisputed evidence that prison officials gave Mr. Rainer a wheelchair in May because he was complaining about complications from this attack, specifically the numbness in his legs was causing him to fall and suffer injuries. And we've already talked about the radiology reports, which show the onset of this new condition in this new area of his back. Now, the district court, despite all that, said there's no, quote, definitive evidence of back pain. That was an error. Definitive evidence is not the summary judgment standard. All that Mr. Rainer needed to do on summary judgment was introduce sufficient evidence for a reasonable jury to conclude that he was indeed suffering severe back pain and numbness in his legs. That's what Mr. Rainer's evidence shows, and that evidence must be credited on summary judgment. Did the district judge have a hearing on this? No. I don't believe so, Your Honor. I was just looking at the paper. And you didn't represent this gentleman below? No, Your Honor. Was he pro se? Yes, he was pro se. Well, he sent it back. Who's going to represent him? I've enjoyed working with him, and I will ask my firm to continue the representation. And finally, I'd like to flesh out with my remaining time this argument about discovery, because I think this is very important to understanding the state of the record in this case, which could be more complete. And here the district court violated the general rule, which is that you can't have summary judgment without a reasonable opportunity for discovery. And to be clear, Mr. Rainer had zero opportunity for discovery here. Now, there may be an exception when discovery would be irrelevant to a controlling question of law, like is the right clearly established? But, as I said, that question is not an issue here. The judge entered a stay of discovery. That's correct, Your Honor. And the stay was never dissolved? The stay was never dissolved. And Mr. Rainer did ask for it to be dissolved in response to summary judgment. The only question here is this ordinary summary judgment question. Is there enough evidence to go to a jury? When that's the question, you need an opportunity to collect that evidence through discovery. And here Mr. Rainer was adamant that he needed discovery to get the security video, to get the prison investigation reports to see what Mr. Pugh knew and when, and his medical records to flesh out the evidence of his serious injury. And so for that reason, it was error to grant summary judgment for a lack of evidence when he was prevented from gathering evidence through discovery. If there are no further questions, I'll reserve the balance of my time. Thank you very much. Mr. Cox? Good morning, Your Honors. Good morning. May it please the Court, my name is Trevor Cox from the Attorney General's Office on behalf of Mr. Pugh. To prevail on his failure to protect claim, Mr. Rainer, of course, must satisfy both the severe injury prong and the deliberate indifference prong. And the Court's colloquy with counsel illuminated some of the deliberate indifference prong. But I really want to focus on the severe injury prong because I think that's what is really fatal to Mr. Rainer's case. How about the lack of discovery? So the Court, in analyzing the discovery requests that Mr. Rainer There was a stay of discovery which was never dissolved. That is correct, Your Honor. And there was summary judgment awarded. That is correct. So how do you get around that? Well, the evidence that would have been dispositive in this case, the kinds of things that would show a severe injury, were not things that were outside of Mr. Rainer's control. Things such as grievances, medical records, which he could have requested from VDSC under operating procedure. Well, maybe some of them aren't outside of his control, but maybe some of them are. Well, there was no He's entitled to all sources of information, not just the ones within his control. But I don't think he needed discovery to get what he would have shown. He had no problem You sought the stay of discovery and said you were going to move for judgment on qualified immunity. That's correct. Did you do that? Did you ask for judgment on qualified immunity? We did, Your Honor. Was it ever ruled on? It was not ruled on. It was not ruled on. It was never ruled on, so the stay was in place. That's correct. I mean, the judge, the district court So he couldn't use the discovery mechanisms authorized by the civil rule. He did not. He was not able to get discovery on the things that he requested. But the things he requested were not relevant to the serious injury prong, which is itself dispositive. He didn't need discovery to get evidence of his own medical condition. He was able to put forward grievances, complaints, all the types of things that happened in August of 2013 when he fell in the shower. He submitted, I think, seven grievances, some in the same day, regarding his slip and fall in the shower in August. But there was nothing from January to August that would evidence a severe and serious injury. I mean, his claim is that he has been in serious debilitating pain, agonizing pain And neither party was deposed, right? That's correct. And I'll point out that he never saw And you tried to knock out some of his statement. It was an affidavit that couldn't be considered because he was ex parte or something. That's correct. Our belief is that the discovery would fully validate what we've been saying. But my point now is that he didn't need discovery to get together the evidence that he would have needed to validate his claim. The kinds of things that he was looking for, he wanted a statement from a mental health officer about whether he had requested a caretaker two months before the incident. He didn't try to depose the nurse. He didn't try to depose people. He couldn't depose anybody because there was this order in place. So it didn't matter. I mean, you think he should have just filed a bunch of discovery motions even though the discovery order was in place? Well, under Rule 56D, as the court knows, if there are facts that somebody believes are essential to his case, he Have you seen the workings of that with a stay like this? No, Your Honor. No, I haven't either. You could be in contempt of the stay order if you undertook discovery while the stay order was in effect, wouldn't you? Not if he provided compelling evidence about why the stay order should be lifted. He didn't try to do that. He didn't say. Well, it was a stay pending resolution of the qualified immunity claim, which was never ruled on. You said that. It was never ruled on, but the court didn't need to because it found that there was no violation. And so even though the court didn't make an explicit finding that there was qualified immunity, it didn't need to because There was no constitutional violation found. One other thing I would point out about discovery is that Rayner said in his filings with the court the things that the court Did consider that those were the items that he believes would show that he was seriously injured. And this is at Joint Appendix 101. He said, here are the things that are going to show. It's my radiological report and it's the affidavit that I submitted. Well, the radiology report does show different injuries than had been shown prior. I mean, notwithstanding what you say, notwithstanding what the district court says, if you line them up, they're different parts of the spine. That's true. There are different reports. That is true. It was taken eight months after the incident. There's no showing of causation. There's no showing of whether it's a severe injury. And, you know, even if you look at it, and he attributes the x-rays being needed to the fact that there was this incident in January. And in previous radiological records, in August of 2005 and April 2012, the reason for the exam listed on the radiology reports was the Inmate fell in the kitchen or the inmate fell and, therefore, an x-ray was needed. In this case, the reason for the exam was that he was morbidly obese and that he had lower back pain. That's at Joint Appendix 177. So even if you look at it. But if you just hypothesize he is correct, that he was hurt, and that, therefore, it is more difficult for him to move, that leads to morbid obesity. And that the pain can, I know from actual personal experience, that you can have an injury and it can get worse and worse and worse until you finally complain about it. So that may all be wrong, but that is possible on this record. With respect, I don't think it is, Your Honor, because he alleges that the injury occurred on January 10th, 2013, and that it has been agonizing, debilitating pain since then, including loss of his legs. But if you look at the record, if you look at the contemporaneous medical treatment. Well, why would that be accepted for purposes of summary judgment? What you just said. What you just said that he said. His naked assertion that, oh, I've been in pain since then. Why wouldn't that be accepted for summary judgment? Well, the Supreme Court has said, and this is from Scott v. Harris, and I'll quote this. When opposing parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury could believe it, a court should not adopt that version of the facts. That's the problem. It's not blatantly contradicted. I believe it is, Your Honor. There is stuff in the record that does support it. Maybe you will be able to show that it's an error, that the new X-ray doesn't make a difference, blah, blah, blah. There's been no showing that that X-ray evidences any kind of injury. What I would point out to the court in terms of being blatantly contradicted by the record is that there's no medical record from any time, whether right after the incident or any time since then, that he had a severe injury. In the few weeks after the incident, when Rayner was going through the grievance process within the prison and was discussing the incident, talking about being hit by mullins, he didn't mention any spinal injury from that. He complains about his TV getting broken but says nothing about any back pain or loss of use of his legs. In fact, the record shows that three months later, in April 2013, he was still working in the kitchen. There was a reference made to May 2013 when he requested a caretaker. Again, he doesn't say anything about a severe spinal injury allegedly as a result of an incident in January 2013. He explains that he's hurt myself a number of times from seizures and blackout. So that's a joint argument. That would be a good argument to the jury. He's got one, too. That's what trials are for. Your Honor, let me try to put it this way. This court has defined a sufficiently serious condition within the meaning of the Eighth Amendment as one that is, quote, so obvious that even a lay person would easily recognize the necessity for a doctor's attention. That was Jackson v. Leitzia case last year. I think, Judge Motz, you were on that. Indeed. And the point is that for seven months following the incident, seven months, Rayner did not once seek medical help for this allegedly severe, debilitating, agonizing pain. So by that standard, it could not possibly be a sufficiently serious injury if he never once raised his hand and said, I'm hurt, I need help. He had no problem submitting grievances, files showing that he asked for medical help from August on. But what about that seven-month period? By the time he did start submitting grievances, he admitted he had fallen in the shower. So there's no, even if there is a severe injury, and I don't, you know, at this point in 2015, who knows whether he does or not, but at the time, there's been no showing of severe injury, let alone any causation that connects it to the January incident, eight months before the x-rays were taken. He argues that, well, the fact that x-rays were even taken at all shows that they were, it was a serious condition. But, of course, x-rays, just the way you take your temperature, are meant to see whether there's a fever. You want to see whether there's an issue. And he submitted no expert testimony or no. No, he had a verified complaint, though. That's what he needs. Those are his allegations. They're verified. But the Scott case says that if it's totally belied, blatantly contradicted by the record, then... You say that your evidence would show that it is belied, but there is other evidence, too. I mean, if you go down what the district court said, you would acknowledge to me that there are some misstatements, some misunderstandings of the record in the district court opinion, wouldn't you? I'm not thinking of any in particular right now. You don't think there are any errors in the district court opinion? I think the district court's opinion could have been longer and more detailed, but I'm not thinking of any. Didn't the district court say that the injuries predated it, exactly the same injuries? In other words, it didn't pick up the difference in the x-rays? I'm not aware of that, Your Honor. Well, you sure know this district court opinion better than I do. So if you tell me that you stand by everything that's said, okay. Well, I think the district court's opinion said that what we need here is expert testimony. We don't need a layperson. We don't need Rayner saying... But the district court had issued an order saying, staying discovery. The district court also... How could there be expert testimony? How could you get an expert with discoveries to stay? Well, the district court also gave a Roseboro notice and said, if you want to submit any affidavits, counter affidavits, you should do that. He only submitted an affidavit in his complaint. He did. He did submit an affidavit, but nothing that would illuminate the meaning of the radiological reports. It's not for the court to look at it and conclude. It's not for him to conclude. The court could ask for its own expert to look at the x-ray. The court could get its own expert. I suppose the court could have done that. I suppose absolutely the court could have. But it didn't reopen discovery. Well, I'll point out that Mr. Rayner didn't ask for that release. Your summary judgment motion for the qualified immunity claim is still under advisement. Mr. Rayner did not ask for that. He did not ask for that relief. The kinds of discovery that he wanted... Well, it was pro se. It was pro se. We have to give him the benefit of everything, all the procedural stuff and everything, because he's pro se, there and all this. He didn't get a lawyer until he came up here. Well, you're supposed to read the pleadings broadly, of course, but he's still subject to the Roseboro Notice. The court told him exactly what he needed to do. He did have the ability, if he chose, to ask for a lifting of the discovery stay. He could have followed up a Rule 56D. What about that video? They said, well, they want to get a video. Do you know whether there's a video existing? I can't represent to the court that there is or there is not. I just don't know. You just don't know? Why don't you know? I'm sorry? Why don't you know? You're the only person we got here to tell us whether it exists or not. Are you representing the State of Virginia, Commonwealth, Great Commonwealth? Why don't you know whether there's a video? I have made inquiries, and the answer is we don't know whether we have the video. I don't think it's relevant, though, to determining whether or not there's a serious debilitating injury here. And that's the evidence that he was asking for was the video. He was also asking for complaints against Pew and other matters. But what's just positive is the lack of a serious injury here. For seven months, seven months, he made no allegation that he was in pain. He didn't try to reach out to get help, whether it was during the grievance process. Well, we don't know whether those are all really the facts or not because we haven't had discovery. Well, Your Honor, he said that the things that he was putting forward showed that there was a serious injury. And he put forward some of the- Well, he's got his verified complaint, as Judge March pointed out to you a couple of times. He's got a verified complaint. That's his affidavit. But you can't- Except that is true. You cannot just get past summary judgment. It makes it a total nullity if you can just say, no, I swear it's true. I mean, the kinds of things that he swore to were that, you know, despite the fact that after the incident and there was medical treatment, he swore, oh, don't worry about what's in there. Well, look at my blood pressure. It's 126 over 100. I'm stating under oath that my blood pressure was high because of the severe spinal injury. Well, he was foreclosed from doing any discovery. So he was foreclosed from putting on an expert of his own. I mean, I don't understand really the State's position here because you well may be right, but he didn't have any tools to do anything more than he did. He did have new records that show a different injury. You say it's not significant, but I'm not sure that either you or I are qualified to interpret these X-rays. The district court said he wasn't, which I certainly understand, but then she said you can't do any discovery. Everything's frozen because I'm going to decide on qualified immunity. Well, there's no assertion, Your Honor, that he tried to get an expert and was not able to. He was able, you know, by the terms of the court's own order and given the Roseboro notice, he was able to submit counter affidavits and any exhibits or evidence that he would like to validate his case. And he believed that the things that he was putting forward were enough. He said that. This is what I need. He was able to put forward lots of grievances from August 2013 on. They just didn't have anything to do with the January incident. It's just incomprehensible that somebody would be in agonizing, serious, debilitating pain for seven months before they would raise their hand and say, I'm in pain. Again, this court said in Jackson. Well, he said the seven months that you're arguing is different than the four months that he's arguing. So we've got a dispute right there on how many months it was. Well, I believe what counsel said. He says it's four months. He's got a print set of four months. You get a print set of seven months. Even that. Even that is enough. I mean, even a week is probably enough. We have to give him the facts. You would agree with that, wouldn't you? Yes, but what I would point out is that the four months that he's referring to, which, again, is an incredibly long time. I believe that the event in May that he's referring to is a request for. Well, why are you arguing seven months if it's four months? Because I don't believe the four months is actually accurate. I believe what he's referring to is the request for. You say he's not entitled to the four months. A request for a caretaker in May 2013, and he references trouble falling. He doesn't attribute it to the January 2013 incident, doesn't attribute it to it. He said, I have seizures and I fall, and I need a caretaker. So, I just don't think a rational fact binder would conclude, a fair-minded jury would conclude that the evidence would validate his position. It may not. The question is whether there is a question of fact yet to be resolved, not whether he would win. Correct. I mean, we're at a different stage here. But summary judgment does provide a gatekeeping function. But summary judgment comes after discovery. Unless you are willing to say on the basis of the facts as set forth in his verified complaint, the state wins. And that's not the argument you've made to him. It's not. But what I'm saying is, Your Honor, that he did not have trouble putting forward the information that he thought would prove his case. He said, I have this affidavit of a radiological exhibit. That's enough. He asked for evidence that didn't go towards showing a spinal injury. And the things that he did put forward, which were entirely in his control, if he had requested help, he could have put forward the evidence that he did. But there wasn't any. There wasn't any. And when his assertion is just that, a naked assertion that is totally contradicted by the record, then the court doesn't have to hold back from granting summary judgment. That's what the Scott case said. There was a similar case, Judge Keenan, I think you were on that Robinson v. Prince George's County, Maryland. This was a few years ago. And the question, there was testimony about whether a shooter had fired a gun. And there was testimony saying, oh, he shot the gun. But there was no evidence to back that up. And the court, relying on Scott, said, look, when there's no evidence that supports an assertion like that, then you can still grant summary judgment. I don't think anybody disagrees with you. I just think you have to look at the record in this case. I mean, he does have the change. He does have new x-rays. He has his verified complaint. He has a witness. And, you know, it's just not the same as having a film that goes the other way, which is what the Supreme Court case was. And now, there may be a film, but you don't know and we don't know if there is. And we don't know what it says on it. What I'd say in response is that the film doesn't go to whether there was a serious injury. I think what's much more telling is that for seven months, he never said he was in pain at all. And I would also point out that in the Robinson case. I thought you said it was four months last time. They would argue that it's four months. I still think it's seven months. But don't you have to give him the benefit, them the benefit? Not if it's not backed up by the record. Okay. So you're saying you're looking at it in the light most favorable to him and saying it's seven months. You have to look at it in the light most favorable to him. Yes. But if he's referring to the fact that he requested a caretaker, in that request, he doesn't tie it to the January incident. He said he has seizures and he falls a lot. One final point on Robinson, which was that was not a video case either. So this Court has interpreted Scott. Oh, to be sure. To be sure. But the Supreme Court case is that's where the. That is correct. So in summary, I would just reiterate that there's no evidence for seven months that there was a severe injury. And on that basis alone, this Court should affirm summary judgment. Thank you. Thank you very much. Do you have rebuttal? Thank you, Your Honor. One quick correction and two points. The May incident that we're referring to is documented at JA 186. It is not. It doesn't deal with the caretaker. It deals with his request for a wheelchair. And it explicitly connects that request to the January 10th injury. He says, Sergeant Maynard, in May of 2013, after I fell and hurt my right ribs and left leg, because of my spine injury in January 10th, 2013, did you get me a loaner wheelchair? And the response is an emphatic yes. Now, I'd like to address quickly this point on the discovery of medical records, because I think what happens here is that the Commonwealth has run out the clock on this. As the Commonwealth said, oh, you don't need discovery. You could have gotten those anyway through this process. And we don't even know if the process that the Commonwealth is referring to was the process in effect at the time. All we have is this unsworn statement in the Commonwealth's brief on appeal. And the grievances that have been filed in this case do show that Mr. Rainer had medical appointments throughout this time, and we don't have the notes from those appointments. We don't have those medical records. And you see all over the JA, 106, 109, 167, 168, evidence that there were these appointments. I'd also like to address the Commonwealth's point. Excuse me. Can I ask you on that point, I take it the state did move for summary judgment? The state moved for summary judgment? Yes. Yes, Your Honor. So when it moved for summary judgment, what was the ‑‑ if it wasn't talking about these unsworn various statements, what was it talking about? Is there a motion for summary judgment in this JA? Yes. I was looking for it. Okay. So can you ‑‑ this can't be very long because the JA is not very long. No, it's not very long. Can you tell me what the basis of it is? It's ‑‑ Your Honor, you'll find it at JA 121. Okay. You go ahead. I didn't mean to interrupt you. I just thought that if you were saying that these were after the fact, the state's argument here with respect to the medical records is the first time it's come up with them. The state's argument that Mr. Raynor had access to them without discovery. Right. Yes, that argument doesn't appear in the summary judgment motion. The Commonwealth also brought up Rule 56D, which says that if you don't have enough time for discovery to oppose summary judgment, you can request additional time. To be clear, that is exactly what Mr. Raynor did. He, on the same day he filed his opposition to summary judgment, he filed a motion to dismiss the protective order. Now, he was pro se, so it's maybe not as articulate as you might find from a counseled motion. But what he's doing here is he's saying, I need more evidence. I need discovery to be able to properly oppose this motion. And this court said in the Harrods case, that's 302F3rd at 244, that where a party through no fault of its own has no reasonable opportunity for discovery and adequately informs the court that more discovery is necessary, you don't need a formal 56D. Is that motion in this mandate? Yes, Your Honor. I believe it is JA194. And finally, I'd just like to address Scott v. Harris and this point about the record blatantly contradicting an affidavit. What you had in Scott v. Harris was discovery. And what you got from discovery was a video. And that is what blatantly contradicted the affidavit in that case. Here, it would be unusual to say the least to apply Scott v. Harris to a record that has not been fleshed out by discovery, because this record lacks exactly what Scott relied on. If there are no further questions, we ask the court to reverse and remand. Thank you. Thank you. Mr. Schmaltz, help me with your last name. Mr. Schmaltz-Beck. Mr. Schmaltz-Beck, we understand that you're court-appointed, and we very much appreciate your efforts. Thank you, Your Honor. It's my pleasure. We will come down and say hello to the lawyers and then go directly to the next case.
judges: Diana Gribbon Motz, Robert B. King, Barbara Milano Keenan